```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
MERCEDES MALATESTA,                 :
                                    :
            Plaintiff,              :    03 Civ. 3690 (MBM)
                                    :
    -against-                       :    OPINION AND ORDER
                                    :
                                    :
CREDIT LYONNAIS,                    :
                                    :
            Defendant.              :
-----------------------------------X
```

APPEARANCES

SAUL D. ZABELL, ESQ.
(Attorney for Plaintiff)
Zabell & Associates, LLP
700 Lakeland Avenue
Bohemia, NY 11716
(631) 589-7242

BARBARA M. ROTH, ESQ.
LAUREN G. KRASNOW, ESQ.
(Attorneys for Defendant)
Torys LLP
237 Park Avenue
New York, NY 10017
(212) 880-6000

MICHAEL B. MUKASEY, U.S.D.J.

Plaintiff Mercedes Malatesta ("Malatesta") sues Credit Lyonnais alleging age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623 (2000); age discrimination in violation of the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 296(1)(a) (2005); age discrimination in violation of the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107 (2003); race discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a); race discrimination in violation of NYSHRL, N.Y. Exec. L. § 296(1)(a); and race discrimination in violation of the NYCHRL, N.Y.C. Admin. Code § 8-107. Defendant Credit Lyonnais moves for summary judgment under Federal Rule of Civil Procedure 56(c). For the reasons set forth below, the motion is granted.

I.

The following facts, viewed in the light most favorable to Malatesta, are relevant to this opinion. Credit Lyonnais, a French bank, hired Malatesta on November 23, 1998, as an Assistant Treasurer. (Malatesta Dep. at 52) The Assistant Treasurer position was eliminated in December 2000, and Credit Lyonnais encouraged Malatesta to seek another position within the bank. (Malatesta Dep. at 59-61) Credit Lyonnais' Human Resources

1

Department arranged for Malatesta to meet with Sandra Horwitz and Sebastion Rocco, the head and deputy head of the Financial Institutions Division ("FID"), about an available data entry position. (Malatesta Dep. at 64-66; Rocco Dep. at 12-13; Haas Aff. ¶ 4) After interviewing Malatesta, Horwitz and Rocco offered her a position as a Commercial Assistant in FID, which Malatesta accepted. (Rocco Dep. at 13; Malatesta Dep. at 67-68) In this position, Malatesta was responsible for manually inputting financial covenant data into a computer program. (Rocco Dep. at 13-14; Malatesta Dep. at 71-72) The Commercial Assistant position did not require credit analysis skills, which Malatesta admits she does not possess. (Rocco Dep. at 61; Malatesta Dep. at 22-23, 26, 28, 59) Horwitz and Rocco agreed to provide Malatesta with whatever training she needed to perform her job and allowed her to draw her prior salary of $51,500 even though Commercial Assistants were usually paid $35,000 to $45,000. (Malatesta Dep. at 66-67; Rocco Dep. at 24; Haas Aff. ¶ 5) At the time she was offered the Commercial Assistant position, Malatesta was 51 years old. (Compl. ¶ 12)

Malatesta began work at FID on December 6, 2000, and she reported directly to Rocco. (Ex. 9; Malatesta Dep. at 127; Rocco Dep. at 17) While at FID, Malatesta received training on the computer systems required for her job and on the Excel spreadsheet computer program. (Ex. 12; Malatesta Dep. at 93, 12-

2

17) Throughout her tenure, Rocco found Malatesta's work to "meet[] expectations." (Ex. 16; Malatesta Dep. at 68; Rocco Dep. at 19)

Malatesta asked Rocco about attending a credit analysis class, which Credit Lyonnais did not offer in house, but Malatesta claims Rocco "didn't pay attention to what I was asking . . . He said we would talk, and he never did." (Malatesta Dep. at 117; Rocco Dep. at 23) Rocco never denied a request by Malatesta to attend a specific credit analysis training class; he simply failed to initiate another conversation on the matter with her. (Rocco Dep. at 23, Malatesta Dep. at 117) At her deposition, Malatesta claimed that while she was at Credit Lyonnais before her transfer to FID, a co-worker received some kind of credit analysis training. (Malatesta Dep. at 160-63) She claims also that Rocco refused to give her any of the credit analysis work she was requesting because she did not "have the background." (Malatesta Dep. at 162) Malatesta offered no other evidence that any other administrative employees were offered credit analysis training or allowed to do credit analysis.

In June 2001, William Denton replaced Horwitz as the head of FID. (Denton Dep. at 9, 29) In July 2001, Credit Lyonnais fully automated the data entry into its covenant monitoring system, thus eliminating the need for Malatesta to enter manually the financial covenant data. (Ex. 20; Rocco Dep. at 16-17) Rocco

3

asked Malatesta to continue to enter financial covenant data manually until all the "bugs" were out of the new computer system. (Malatesta Dep. at 105; Rocco Dep. at 30-31) Beginning in late 2001, Credit Lyonnais suffered an economic downturn and asked all division heads to cut costs and employees. (Ex. 23; Haas Aff. ¶ 7, 10; Rocco Dep. at 65; Denton Dep. at 37-38, 58-59)

By early 2002, most of Malatesta's duties were automated and her only remaining duty was to input new data from each client's covenant compliance report that took "only a few minutes" per report. (Rocco Aff. ¶ 7; Rocco Dep. at 30-31, 37, 44; Malatesta Dep. at 105) During that time, Denton and Rocco gave Hazel Chin ("Chin"), one of FID's senior credit analysts, responsibility over spotting and managing negative loan trends through daily analysis of all of the FID clients' covenant data. (Ex. 26) Rocco and Denton decided it would be more cost efficient for Chin, rather than Malatesta, to input new data from each client's covenant compliance report while she was conducting her daily analysis. (Ex. 28, 30; Rocco Aff. ¶ 7; Denton Aff. ¶ 8)

In April 2002, Denton and Rocco identified Malatesta's position as a non-essential job that could be eliminated. (Ex. 28, Denton Dep. at 31) At this time, Rocco encouraged Malatesta to search for another position in Credit Lyonnais, which she did. (Malatesta Dep. at 156, 158; Rocco Dep. 31-32; Denton Dep. at 23-24) However, there were no positions available for Malatesta

4

within Credit Lyonnais due to the bank-wide mandate to eliminate non-essential positions and reduce the number of employees. (Haas Aff. ¶ 10) On July 24, 2002, Credit Lyonnais informed Malatesta that her position was eliminated and her employment was terminated. (Malatesta Dep. at 146-47; Denton Dep. at 30-31; Haas Aff. ¶ 11) Credit Lyonnais did not hire anyone new to replace Malatesta. (Denton Aff. ¶ 10, Rocco Aff. ¶ 10) Her few remaining data entry tasks were performed either by the credit analysts responsible for the clients or by Chin. (Denton Dep. at 32-33, 35)

Due to the economic downturn and an "unprecedented loss" in 2001, the amount of money available for salary increases and bonuses was limited. (Denton Aff. ¶ 5; Hass Aff. ¶ 9) Most FID employees did not receive a salary increase between 2001 and 2002, but Malatesta did receive a $1,100 raise. (Haas Aff. ¶ 9) However, Malatesta did not receive a bonus for 2001. (Malatesta Dep. at 58-59) The Credit Lyonnais employee handbook, which Malatesta received and acknowledged her understanding of, contains a discretionary bonus policy stating that "Management . . . may, in its discretion, grant a bonus to any or all of its employees. . . . Payment of a bonus is not guaranteed; management may choose to grant or not grant a bonus at year-end to any or all of its employees." (Malatesta Dep. at 58-59; Ex. 2, 3) In early 2002, Denton recommended to Credit Lyonnais' Executive

Management that all members of the FID team, including Malatesta, be given bonuses for 2001. (Denton Aff. ¶ 7) Executive Management rejected this recommendation, and bonuses were paid only to FID's relationship managers, credit analysts, and one file clerk who received a high evaluation and took on substantial additional duties. (Haas Aff. ¶ 9; Denton Aff. ¶ 7)

Malatesta claims that Denton discriminated against her on the basis of her age and race, because he did not always say "good morning" to her, treated her like a "piece of furniture," looked at her "like [she] was hungry" after she took a piece of bread from a wine and cheese reception in his office, and did not send her a card or flowers when she underwent surgery. (Malatesta Dep. at 128, 153-54, 163-64) Malatesta alleges she had "a feeling" Denton did not like her "nationality" because he might have "a problem in his life with somebody, with a Spanish woman." (Malatesta Dep. at 128) Malatesta claims Rocco discriminated against her, "because some people don't like certain races" and "maybe he didn't want all the ladies in there, maybe he wanted younger ladies. There [are] a lot of men[] that . . . want younger ladies in their department." (Malatesta Dep. at 183-84) Malatesta does not present evidence of a single comment or action taken by either Denton or Rocco that references her age or race. The only age-related comment she claims to have heard or seen during her employment at Credit Lyonnais cane in a department-

wide email sent by an administrative assistant inviting all FID employees to an "over the hill celebration" of Malatesta's and another employee's birthday. (Malatesta Dep. at 167-70; Ex. 36) Malatesta received the Credit Lyonnais employee handbook, which outlined the company policy for reporting discriminatory conduct. (Malatesta Dep. at 58; Ex. 6)  Malatesta does not allege that she complained of discrimination to anyone at Credit Lyonnais and the Vice President of Human Resources at Credit Lyonnais had no knowledge of any such complaints. (Hass Aff. ¶ 12)

On December 26, 2002, Malatesta filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC), alleging age and race discrimination. (Ex. 34) On March 13, 2003, Maltesta received a Notice of Right to Sue from the EEOC. (Ex. 35) Malatesta filed her complaint against Credit Lyonnais on August 21, 2003.

## II.

Malatesta alleges that Credit Lyonnais should be held liable under the ADEA, Title VII, the NYSHRL, and the NYCHRL for denying her training, awarding her a raise and bonus that were too small, and terminating her employment on account of her age and race.  Credit Lyonnais moves for summary judgment on Malatesta's ADEA, Title VII, NYSHRL, and NYCHRL claims related to age and race discrimination on the grounds that she does not

7

provide sufficient evidence to raise an inference of discrimination regarding any of the aforementioned employment actions and, in the alternative, that Credit Lyonnais articulated a legitimate, non-discriminatory reason for all of its actions and Malatesta does not present any evidence that these reasons are a pretext for bias.

The ADEA makes it unlawful "for an employer to . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). As the NYSHRL and NYCHRL contain provisions comparable to the ADEA and Title VII and New York courts require the same standard of proof for claims brought under the NYSHRL and the NYCHRL as for those brought under the ADEA and Title VII, Malatesta's federal and state claims can be analyzed together. See Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 n.1 (2d Cir. 2000)(ADEA); Dawson v. Bumble & Bumble, 398 F.3d 211, 217 (2d Cir. 2005) (Title VII). Moreover, the same framework is used to establish discrimination under Title VII and the ADEA, so all of Malatesta's

discrimination claims will be analyzed together. Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001).

To have an actionable claim under the ADEA and Title VII, Malatesta must first establish a prima facie case of unlawful discrimination. Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 63 (2d Cir. 1997). To establish a prima facie case, Malatesta must show that: (1) she was within the protected group; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the action took place under circumstances giving rise to an inference of discrimination. Schnabel v. Abramson, 232 F.3d 83, 87 (2d Cir. 2000). The burden of proof for establishing a prima facie case under the ADEA and Title VII is minimal. Id.

If Malatesta establishes a prima facie case, a rebuttable presumption of discrimination arises and the burden of production shifts to Credit Lyonnais to show that there was a legitimate, non-discriminatory reason for the adverse employment actions. See Stratton v. Dept. for the Aging of New York, 132 F.3d 369-70 (2d Cir. 1997). If a legitimate, non-discriminatory reason is given for the actions, then the presumption of discrimination is rebutted and it "simply drops out of the picture." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993). Malatesta then must show, without the benefit of a presumption, that her age or race "was the real reason for" the

adverse employment actions. Schnabel, 232 F.3d at 87.

Malatesta does not carry even the minimal burden of establishing a prima facie case of discrimination under the ADEA or Title VII, because she does not present sufficient evidence to give rise to an inference of discrimination. She does fall within the protected classes because she is of Cuban descent and was between 51 and 52 years old when the adverse employment actions occurred. 29 U.S.C. § 631(a) (limiting prohibitions of ADEA to individuals at least 40 years old); 42 U.S.C. § 2000e-2(a). Also, Malatesta was qualified for the position because she received good evaluations, received a salary raise, and was hired by the same supervisor who later fired her. See Gregory v. Daly, 243 F.3d 687, 696 (2d Cir. 2001) (holding inference of minimal qualification not difficult to draw where employer hired employee and termination is at issue); Minott v. Port Authority of N.Y. & N.J., 116 F. Supp. 2d 573, 520 (S.D.N.Y. 2000) (finding plaintiff qualified for position due to good evaluations). Further, Credit Lyonnais does not contest that Malatesta suffered adverse employment actions when she was not provided with training, was not given a bonus or more substantial raise, and had her employment terminated.

However, Malatesta does not provide sufficient evidence to warrant an inference -- even at the prima facie stage -- that she was the victim of age or race discrimination. Circumstances

contributing to an inference of discriminatory intent include the criticism of plaintiff's performance in racially or age-related degrading terms, Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1188 (2d Cir. 1987), an employer's invidious comments about others in the employee's protected group, Ostrowski v. Atlantic Mutual Insurance Companies, 968 F.2d 171, 182 (2d Cir. 1992), or the more favorable treatment of "similarly situated" employees not in the protected group, Feingold v. New York, 366 F.3d 138, 153 (2d Cir. 2004). Malatesta demonstrates none of these.

Malatesta does not present evidence of a single age or race discriminatory comment or criticism made by Rocco or Denton directed toward either her or others in her protected groups. She merely alleges that, because Denton generally ignored her apart from job-related discussions, she had a "feeling" he did not like her "nationality" because he might have had "a problem . . . with a Spanish woman." (Malatesta Dep. at 128, 153-54, 163-64). As to Rocco, her only allegation is that she believes that "some people don't like certain races" and that a lot of men "want younger ladies in their department." (Malatesta Dep. at 183-84) It suffices to point out that there is absolutely no evidence to ascribe such views of Rocco, and that a supervisor does not commit age or race discrimination merely because he does not engage his employee in friendly conversation or send her gifts when she is ill.

The only age-related comment made to Malatesta during her entire tenure at Credit Lyonnais came in an email sent by an administrative assistant inviting all FID employees to an "over the hill celebration" of Malatesta's and another employee's birthdays. (Ex. 36) Neither Denton nor Rocco asked the administrative assistant to distribute this email and neither of them screened it before it was sent out. (Denton Dep. at 69; Rocco Aff. ¶11). Because neither supervisor was responsible for the email, it provides no evidence to support Malatesta's claims. See Castro v. New York City Bd. of Ed. Personnel, No. 96 Civ. 6314 (MBM), 1998 WL 108004, at * 5 (S.D.N.Y. Mar. 12, 1998). Furthermore, a single statement that someone is "over the hill" is considered a stray remark, which has been held not to be sufficient evidence to support an age discrimination claim. See Bern v. United Mercantile Agencies, 942 F. Supp. 217, 219-20 (S.D.N.Y. 1996) ("Many courts have held that stray remarks in the workplace, by themselves, and without a demonstrated nexus to the complained of personnel actions will not defeat the employer's summary judgment motions."); Spence v. Maryland Casaulty, 803 F. Supp. 649 (S.D.N.Y. 1992), aff'd 945 F.2d 1146 (2d Cir. 1993) (holding "over the hill" to be a stray remark).

Malatesta provides no evidence that a similarly situated Credit Lyonnais employee received more favorable treatment with regard to training opportunities, raises and

bonuses, or firing. Rocco's decision not to pursue Malatesta's one request for credit analysis training does not give rise to an inference of discrimination because such training was not necessary for -- or even related to -- her job duties.[1] Cotanzo v. United States Postal Serv., No. 00 Civ. 5044, 2003 WL 1701998, at *8 (S.D.N.Y. Mar. 31, 2003) (being excluded from training because it was not required for plaintiff's position does not give rise to a claim for discrimination). The only evidence she presents of a similarly situated employee not in her protected groups being provided with credit analysis training is that she believes a younger African American coworker, who was not in FID and not supervised by Rocco, and whose full name, age, and position within Credit Lyonnais Malatesta does not know, was provided with credit analysis training. (Malatesta Dep. at 160-63) Due to the lack of information provided about that co-worker,

---

[1] It is also doubtful that exclusions from such training sessions are adverse employment actions due to the lack of evidence that they materially affected Malatesta's working conditions or her prospects for promotion as she did not have the same educational background as the other credit analysts. Brennan v. City of White Plains, 67 F. Supp. 2d 362, 374 (S.D.N.Y. 1999) (finding that plaintiff's exclusion from meeting was not an adverse employment action when it was not shown that it affected her working conditions); Copeland v. Sears, Roebuck & Co., 25 F. Supp. 2d 412, 417 (S.D.N.Y. 1998) (holding that an employer's failure to provide training was not an adverse employment action when training would not qualify plaintiff for promotion or lead to wage increase); Cf. Little v. Nat'l Broad. Co., 210 F. Supp. 2d 330, 381 (S.D.N.Y. 2002) ("Because this training would have resulted in greater job security and more overtime hours, the denial of such training may constitute an adverse employment action.").

13

there are no grounds upon which to determine that she and Malatesta were similarly situated. See Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 96 (2d Cir. 1999) (holding that plaintiff must provide proof that the two employees "must have been subject to the same standards governing performance evaluation and discipline, and must have engaged in conduct similar to the plaintiff's . . .")(internal quotation marks and citation omitted); Rose v. Panolam Indus. Int'l, Inc., 301 F. Supp. 2d 239, 244 (D. Conn. 2004) (holding two employees were not similarly situated with regard to training opportunities because they used different software programs to perform their daily duties).

An inference of age discrimination can arise when a plaintiff's job responsibilities are taken over by a younger employee. See Tashis v. Riese Org., 211 F.3d 30, 38 (2d Cir. 2001). However, such an inference is not warranted here, because, although Malatesta's few remaining duties were taken over by Chin, who appeared to be under 40 (Rocco Dep. at 67-68), and two "young people" took files from Malatesta during her last week at Credit Lyonnais (Malatesta Dep. at 144-45), the email and memoranda among Denton, Rocco, and Executive Management about reducing unnecessary positions provide specific evidence that most of Malatesta's responsibilities were automated or were transferred to Chin because they meshed well with Chin's job

14

responsibilities, not for any discriminatory reason. (Ex. 28-30, 33) See Fagan v. New York State Elec. & Gas Corp., 186 F.3d 127, 134 (2d Cir. 1999) ("The replacement of an older worker with a younger worker or workers does not itself prove unlawful discrimination.").

Malatesta also presents no evidence that a similarly situated employee who was not a member of her protected groups was provided with a larger raise or a bonus in 2001. Many other administrative employees were provided with neither raises nor bonuses in 2001. (Denton Dep. at 27; Hass Aff. ¶9) In fact, Malatesta was one of the few administrative employees in the entire bank to receive a raise in 2001. (Hass Aff. ¶ 9) Only one FID administrative employee received a bonus in 2001, and she was not situated similarly to Malatesta because she was a file clerk who undertook substantial additional responsibilities, she received a better performance evaluation than Malatesta, and her salary was less than half of Malatesta's. (Denton Aff. ¶ 7, Hass Aff. ¶ 9) Further, although bonuses may have been distributed differently than they were in previous years, such allocation is discretionary under Credit Lyonnais' policy. As Malatesta fails to identify a similarly situated employee who was granted a higher raise or bonus than she was in 2001 and she fails to produce evidence of any statements, actions, or other circumstances that concretely show race or age animus, her small

15

2001 raise and lack of a bonus do not establish discriminatory intent. See Lumhoo v. The Home Depot USA, Inc., 229 F. Supp. 2d 121, 149 (E.D.N.Y. 2002).

Even assuming Malatesta did present a prima facie case of age and race discrimination, Credit Lyonnais can rebut her prima facie case by "articulat[ing] -- but . . . not prov[ing]" a legitimate, non-discriminatory reason for all of the adverse employment actions. Fisher v. Vassar College, 70 F.3d 1420, 1433 (2d Cir. 1995). Credit Lyonnais does provide such a legitimate, non-discriminatory reason because the credit analyst training requested by Malatesta was not required for her position nor did she have the necessary educational background to be a credit analyst; raises and bonuses for 2001 were non-existent for many employees, including those in administrative position similar to Malatesta's, because of the financial downturn; and she was fired because most of her work duties were automated and Credit Lyonnais was undergoing a reduction in force.

Because Credit Lyonnais articulated a legitimate, non-discriminatory reason for adverse employment actions, the burden shifts back to Malatesta to present evidence sufficient for a reasonable jury to conclude that Credit Lyonnais discriminated against her because of her age and race. She must show both that Credit Lyonnais' legitimate, non-discriminatory reason was a pretext and that the pretext was used to hide the discrimination.

Hollander v. Am. Cyanamid Co., 172 F.3d 192, 200 (2d Cir. 1999). "Absent discrimination, 'the employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or no reason at all, so long as its action is not for a discriminatory reason.'" Mohamed v. Marriott Int'l, Inc., 905 F. Supp. 141, 151 (S.D.N.Y. 1995) (quoting Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1187 (11th Cir. 1983)).

Malatesta does not present sufficient evidence for a reasonable jury to conclude she was more likely than not fired on the basis of her age and race. She does not allege that either Rocco or Denton made a single age or race related comment to her; the only discriminatory comment she cites was a stray remark by an administrative assistant who played no role whatsoever in any employment decisions. She does not point to any similarly situated employees not within her protected groups who were treated differently.

Malatesta's task in illustrating that the reason for the adverse employment actions was more likely than not discriminatory is especially difficult, because Rocco, the supervisor at least partially responsible for all of the adverse employment actions, was also the supervisor who hired her and gave her good performance reviews. See Grady v. Affiliated Cent., Inc., 103 F.3d 553, 560 (2d Cir. 1997) ("Some factors strongly suggest that invidious discrimination was unlikely. For example,

17

where the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire."); See Connell v. Consol. Edison Co. of New York, Inc., 109 F. Supp. 2d 202, 210 (S.D.N.Y. 2000) ("Because the same people who approved an incentive award for plaintiff only the year before made the decision to discharge him, this factor also suggests that discrimination was not a cause of his layoff."). That Rocco hired Malatesta and gave her good performance reviews, and that Denton granted her a salary raise and recommended that Executive Management award her a bonus, weigh heavily against there being a discriminatory reason for the adverse employment actions.

Malatesta has failed to show a basis for claims under the ADEA, Title VII, the NYSHRL, and the NYCHRL for age and race discrimination.

\*         \*         \*

For the above reasons, defendant's motion for summary judgment is granted, and the complaint is dismissed.

SO ORDERED:

_[signature]_

Dated: New York, New York
November 21, 2005

Michael B. Mukasey
U.S. District Judge